**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| JOANNE McWHORTER, | ) | CASE NO.  1:10-cv-635 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE GWIN |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| MICHAEL J. ASTRUE, | ) | VECCHIARELLI |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | **REPORT & RECOMMENDATION** |

Plaintiff, Joanne McWhorter, challenges the final decision of Defendant, Michael

J. Astrue, Commissioner of Social Security (the "Commissioner"), terminating Plaintiff's

disability status as of December 1, 2005, which terminated Plaintiff's Social Security

Income Benefits ("SSI") as of February 28, 2006.  This Court has jurisdiction pursuant

to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate

Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.

For the reasons set forth below, the Commissioner's final decision should be

AFFIRMED.

## I.  PROCEDURAL HISTORY

On November 8, 1996, Plaintiff applied for SSI alleging a disability onset date of October 6, 1994.  (Tr. 33.)  Plaintiff was found disabled on March 5, 1997, because of borderline intellect, a depressive disorder, and a pain disorder.  (Tr. 15.)   She received SSI benefits as of November 1, 1996.  (Tr. 15.)

On or around December 29, 2005, the Social Security Administration found that Plaintiff's disability ceased as of December 1, 2005.  (Tr. 15, 39.)  Plaintiff's benefits were to terminate three months later, on February 28, 2006.  (Tr. 15, 39.)  On February 22, 2007, these findings were affirmed upon reconsideration.  (Tr. 15, 61.)  On March 1, 2007, Plaintiff filed an application for a hearing before an administrative law judge ("ALJ").  (Tr. 64.)

On October 3, 2008, Plaintiff initially appeared before an ALJ for her hearing  (Tr. 409); however, Plaintiff did not have counsel at that hearing, so the ALJ rescheduled the hearing so that Plaintiff would be able to obtain a representative (Tr. 412-16). On December 19, 2008, an ALJ held Plaintiff's hearing.  (Tr. 13.)  Plaintiff was represented by counsel.  (Tr. 13.)  A vocational expert ("VE") also testified.  (Tr. 418, 436-39.)  On February 4, 2009, the ALJ found that Plaintiff's disability under the Social Security Act ceased on December 1, 2005.  (Tr. 22.)  On January 29, 2010, the Appeals Council notified Plaintiff that it declined to review the ALJ's decision, so the ALJ's decision became the final decision of the Commissioner.  On March 26, 2010, Plaintiff filed her complaint in this Court.  (Doc. No. 1.)

Plaintiff asserts three assignments of error:  (1) the ALJ erroneously found that Plaintiff's medical condition improved; (2) the ALJ erroneously found that Plaintiff did

not meet or medically equal Listing 12.05(C) of 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"); and (3) the ALJ failed to give good reasons for the weight he gave Plaintiff's treating physician's opinions.

## II.   EVIDENCE

### A.   Personal and Vocational Evidence

Plaintiff was 45 years old on December 1, 2005, when her disability status was terminated.  (Tr. 424.)  She did not finish high school (Tr. 58, 264, 424) and had a minimal, sporadic work history (Tr. 96-101, 109).  She did not have past relevant work experience.  (Tr. 20.)

### B.   Medical Evidence

#### 1.   Plaintiff's Physical Condition

On February 4, 2004, Plaintiff presented to MetroHealth Medical Center's Emergency Department with a complaint of lower back pain.  (Tr. 232.)  The intake report indicates that Plaintiff's pain was "sharp," "throbbing", and rated at 8 out of 10 in severity.  (Tr. 232.)  The report further indicated that nothing alleviated Plaintiff's pain, and the pain was aggravated by physical activity.  (Tr. 232.)

On February 19, 2004, Dr. Harvey West, M.D., interpreted the results of an x-ray of Plaintiff's back and diagnosed Plaintiff with prominent degenerative disc disease at the L5 - S1 vertebrae.  (Tr. 191.)

On May 16, 2005, Plaintiff presented to MetroHealth Medical Center's Medical Care Department complaining of various ailments such as an infection and fever, as well as "stabbing" back pain.  (Tr. 245.)  The intake report indicates that Plaintiff's pain had worsened since the week before and was aggravated by sitting and walking.  (Tr.

3

245.)  The attending physician, Dr. Marissa Rubio, suggested that Plaintiff follow-up on her back pain with a primary care physician to discuss pain management options.  (*See* Tr. 246.)

On August 11, 2005, Plaintiff presented to MetroHealth Medical Center's Emergency Department complaining of "moderate, achy to sharp pain" in her lower back.  (Tr. 257.)  Nurse Practitioner Steven Vozel indicated that Plaintiff suffered "acute or chronic back pain" (Tr. 254), and Registered Nurse Cynthia Davis assessed Plaintiff with "acute back strain" (Tr. 258).  Plaintiff was discharged in stable condition, and was given medication and instructions for her back pain.  (Tr. 258.)

On April 17, 2006, state agency medical consultant Jon Starr[1] performed a physical residual functional capacity assessment of Plaintiff.  (Tr. 161-68.)  Mr. Starr's assessment is as follows.  Plaintiff's primary diagnosis was degenerative joint disease, and her secondary diagnosis was obesity.  (Tr. 161.)  Plaintiff could occasionally lift up to 50 pounds; frequently lift up to 25 pounds; and sit, stand, and walk (with normal breaks) for approximately 6 hours in an 8-hour workday.  (Tr. 162.)  Plaintiff had an unlimited ability to push or pull, except to the extent that she was limited in her ability to lift and carry.  (Tr. 162.)  Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations.  (Tr. 163-65.)  Although there was some basis for Plaintiff's allegations of pain, Plaintiff's "subjective complaints far outweigh[ed] the objective medical findings."  (Tr. 166.)

On November 29, 2006, Plaintiff presented to Dr. Hong Shen, M.D., at Lutheran

_____

[1] The record does not indicate Mr. Starr's credentials.

4

Hospital's Pain Management Center upon Plaintiff's own referral with complaints of chronic low back pain.  (Tr. 278.)  The intake report indicates the following.  Plaintiff's "pain [was] located on her lower back and radiated down both hips, rump, and groin bilaterally."  (Tr. 278.)  Plaintiff's low back pain had been treated at MetroHealth Medical Center's Emergency Department with Percocet and Motrin.  (Tr. 278.)  Plaintiff described her pain as constant and burning; and she rated her pain generally at 9 out of 10 in severity, at its best at 5 out of 10 in severity, and at its worst at 10 out of 10 in severity.  (Tr. 278.)  Plaintiff also complained that she felt "as if something [were] running and burning in her anterior right leg."  (Tr. 278.)  She denied leg length discomfort, however.  (Tr. 278.)  Movement and cold weather aggravated her pain, and resting partially helped it.  (Tr. 278.)  Plaintiff was "independent with her personal care and sometimes needed assistance with her household tasks."  (Tr. 278.)  Furthermore, she slept six hours and was awakened by her pain.  (Tr. 278.)

Dr. Shen diagnosed Plaintiff with chronic mechanical low back pain and lumbar radiculopathy and indicated that he would have an MRI performed on Plaintiff's lumbar spine before he devised a treatment plan.  (Tr. 280.)

Plaintiff presented to Dr. Shen on December 15, 2006, and April 20, 2007.  (Tr. 402-405.)  On April 20, 2007, Dr. Shen indicated that Plaintiff reported her pain at 9 out of 10 in severity and requested stronger medication than the Lyrica that Dr. Shen was then prescribing.  (Tr. 405.)  Dr. Shen increased Plaintiff's Lyrica prescription and indicated that he would refer Plaintiff to "Dr. Covington's Chronic Rehab Program due to her significant psychiatric issues and chronic back pain without significant pathological findings."  (Tr. 405.)

On July 11, 2007, Plaintiff presented to Dr. Zahra Merchant, M.D., with complaints of generalized low back pain.  (Tr. 314.)  Dr. Merchant indicated that Plaintiff reported the following.  Plaintiff's pain was constant with occasional increases in intensity.  (Tr. 314.)  The pain over the prior ten days rated at best at 7 or 8 out of 10 in severity, and at worst at 9 out of 10 in severity.  (Tr. 314.)  The pain was mostly localized, although it sometimes radiated more to the right lateral thigh than the left.  (Tr. 314.)  The pain was aggravated by prolonged standing, walking, sitting, and lying supine, and was relieved by changing positions.  (Tr. 314.)  There was no numbness, tingling, or weakness associated with the pain, however.  (Tr. 314.)

Plaintiff sought care at MetroHealth Medical Center rather than Lutheran Hospital because Lutheran Hospital recommended that Plaintiff obtain epidural steroid injections for her pain and Plaintiff did not want such treatment.  (*See* Tr. 314.)  Dr. Merchant recommended that Plaintiff engage in physical therapy, counseled Plaintiff on the importance of weight loss, and prescribed Plaintiff Tylenol with Codeine.  (Tr. 316.)

On September 11, 2007, Plaintiff returned to Dr. Merchant for a follow-up on her chronic lower back pain.  (Tr. 323.)  Dr. Merchant indicated that Plaintiff's pain was unchanged since her last visit and that Plaintiff still refused to obtain epidural steroid injections.  (Tr. 323.)  Dr. Merchant diagnosed Plaintiff with "osteoarthritis of the lumbar spine at multiple levels with chronic low back pain further aggravated by increased bilateral rectus femoris muscle contracture."  (Tr. 325.)  Dr. Merchant increased Plaintiff's Tylenol dosage, instructed Plaintiff to engage in physical therapy, and counseled Plaintiff on the importance of losing weight.  (Tr. 325.)

On January 8, 2008, Plaintiff again presented to Dr. Merchant for a follow-up on

6

her chronic lower back pain.  (Tr. 358.)  Dr. Merchant indicated that Plaintiff reported the following.  Plaintiff's pain had improved by approximately 25% since Plaintiff began taking Vicodin.  (Tr. 358.)  Plaintiff's pain at the time rated at 7 out of 10 in severity.  (Tr. 358.)  Plaintiff could stand or walk for about two to three minutes before she had to sit down because of her pain.  (Tr. 358.)  Although Plaintiff tried to do household chores, she often was unable to complete them because she had to sit down.  (Tr. 358.)  The pain was constant and varied in intensity with activity such as bending, stooping, standing, or walking for longer than three to five minutes.  (Tr. 358.)  Plaintiff obtained only minimal relief from her medications, although there was no weakness, numbness, or tingling associated with the pain.  (Tr. 358.)

## 2.    Plaintiff's Mental Condition

On January 3, 1997, Dr. Joseph Konieczny, Ph.D, performed a psychological evaluation of Plaintiff.  (Tr. 108.)  Dr. Konieczny indicated that Plaintiff had a Verbal IQ of 68, Performance IQ of 70, and Full Scale IQ of 67.  (Tr. 112.)  Dr. Konieczny indicated that Plaintiff's IQ scores placed Plaintiff in the deficient range of intellectual functioning; however, Dr. Konieczny explained that Plaintiff's history, presentation, and "questionable" effort during testing cast doubt on these IQ scores.  (Tr. 113.)  Ultimately, Dr. Konieczny diagnosed Plaintiff with Borderline Intellectual Functioning.  (Tr. 113.)  Dr. Konieczny further indicated that "Despite [Plaintiff's] questionable motivation and effort during the testing, it would not appear that a formal diagnosis of Malingering would be warranted."[2]  (Tr. 113.)  Dr. Konieczny also diagnosed Plaintiff

---

[2]  Malingering is "the voluntary production of symptoms."  *Re v. Snyder*, 293 F.3d 678, 681 (3d Cir. 2002).

7

with a depressive disorder and assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 56.[3]  (Tr. 113.)

Between January 13, 2005, and September 14, 2006, Plaintiff presented to Dr. Saroj Brar, M.D., for psychiatric evaluation and treatment.  (*See* Tr. 177-86.)  Dr. Brar indicated that Plaintiff suffered a depressed mood for the prior six years.  (Tr. 184.)  Dr. Brar diagnosed Plaintiff with depression (Tr. 185) and assigned Plaintiff a GAF score of 70[4] (Tr. 186).

On May 12, 2005, psychologist Dr. Herschel Pickholtz performed a psychological clinical interview of Plaintiff at the request of the Bureau of Disability Determination. (Tr. 136-40.)  Dr. Pickholtz indicated that Plaintiff reported the following.  Plaintiff last worked at a restaurant approximately two years prior for five months and left that job because the restaurant closed.  (Tr. 136.)  Before that, Plaintiff had worked at a different restaurant as a waitress for about a year and left that job so she could go to school to study computers.  (Tr. 136.)

Plaintiff received counseling for depression "a while ago," and had been seeing another psychiatrist for about six months.  (Tr. 136.)  She was "irritable and upset," and

---

[3]  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  A person who scores in this range may have a flat affect, occasional panic attacks, few friends, or conflicts with peers and co-workers.  *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. rev., 2000).

[4]  A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning.  A person who scores in this range may have a depressed mood, mild insomnia, or occasional truancy, but is generally functioning pretty well and has some meaningful interpersonal relationships.  *See Diagnostic and Statistical Manual of Mental Disorders*, *supra*, at 34.

8

she described her "life" as depressing because she had no money or plans for the future.  (Tr. 136.)

Plaintiff could take care of herself, made sure her children went to school, vacuumed once a week, swept and mopped every three days, did the laundry once a week, went grocery shopping once a month, went shopping for clothes once or twice a month, sometimes took her children to the movie theater, sometimes went to church, and went to parent-teacher meetings on a regular basis.  (Tr. 137-38.)

Dr. Pickholtz indicated that Plaintiff's description of her mental status would suggest a GAF score of 40;[5] however Dr. Pickholtz opined that a GAF score of 65[6] was more accurate because Plaintiff exhibited higher levels of functioning and seemed prone to exaggerate.  (Tr. 140.)

On October 10, 2005, psychological consultant Roy Shapiro[7] performed a psychiatric review and mental residual functional capacity ("RFC") assessment of Plaintiff.  (Tr. 142-58.)  In the psychiatric review, Mr. Shapiro indicated the following. Plaintiff suffered depression (Tr. 145) and mixed personality disorder (Tr. 149).  Plaintiff suffered moderate limitations in her ability to maintain concentration, persistence, or pace; and mild limitations in her activities of daily living and in maintaining social

---

[5]  A GAF score between 31 and 40 indicates some impairment in reality testing or communication or major impairment in several areas such as work or school, family relations, judgment, thinking, or mood.  A person who scores in this range may have illogical or irrelevant speech, and may avoid friends, neglect family, and be unable to work.  *See Diagnostic and Statistical Manual of Mental Disorders*, *supra*, at 34.

[6]  *See supra* note 4.

[7]  The record does not indicate Mr. Shapiro's credentials.

9

functioning.  (Tr. 152.)  Plaintiff suffered no episodes of decompensation.  (Tr. 152.)

Mr. Shapiro also noted the following.  Plaintiff exhibited "questionable effort on exam."  (Tr. 154.)  Plaintiff had a GAF score of 56[8] at the time she was found disabled and that her then current GAF score was 65.[9]  (Tr. 154.)  Mr. Shapiro concluded that "There are clear improvements in vegetative signs of depression," and "med improvement is established."  (Tr. 154.)

In his mental RFC assessment,  Mr. Shapiro indicated that Plaintiff was moderately limited in her abilities:  to remember locations and work-like procedures; to understand, remember, and carry out detailed instructions; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting.  (Tr. 156-57.)  Plaintiff was not significantly limited in all other areas of functioning.  (Tr. 156-57.)

Mr. Shapiro also noted that Plaintiff was able to perform all household chores and took care of two children.  (Tr. 158.)  Further, Plaintiff suffered only mild to moderate limitations from her depression and personality disorder, and could sustain

---

[8]  *See supra* note 3.

[9]  *See supra* note 4.

10

simple and some complex tasks, handle routine changes, and cope with social demands.  (Tr. 158.)

On April 26, 2006, psychological consultant Dr. Cindy Lou Matyi, Ph.D., performed a psychiatric review of Plaintiff.  Dr. Matyi determined that Plaintiff had an affective disorder (Tr. 172) and a personality disorder (Tr. 173), but that these caused only mild limitations in Plaintiff's:  activities of daily living; ability to maintaining social functioning; and ability to maintain concentration, persistence, or pace (Tr. 174).  Dr. Matyi found that Plaintiff suffered no episodes of decompensation.  (Tr. 174.)  Although Plaintiff's IQ scores fell in the upper mild mentally retarded range, Dr. Matyi considered the scores underestimates because Plaintiff exhibited poor effort.  (Tr. 176.)  Dr. Matyi observed that Plaintiff's depression appeared well-controlled by medication, and that Plaintiff's day-to-day functioning was good as Plaintiff maintained a household, cared for her children and a cat, ran errands, prepared meals, visited family, and attended church.  (Tr. 176.)

On August 24, 2006, Plaintiff underwent an Adult Diagnostic Assessment at Bridgeway.  (Tr. 263-71.)  Plaintiff reported that she felt as if she could not communicate with people well, could not be around people too long, heard voices, became frustrated and irritable often, was frightened, had thoughts about not wanting to live, and sometimes wished she were dead.  (Tr. 263.)  The social worker who assessed Plaintiff indicated that Plaintiff was concerned that her symptoms and behavior were affecting her ability to raise her children.  (Tr. 269.)  The social worker recommended that Plaintiff obtain counseling to reduce her depressive symptoms and address any underlying issues.  (Tr. 270.)

11

On December 9, 2006, Dr. Brar filled out a Mental Impairment Questionnaire regarding Plaintiff.  (Tr. 281)  Dr. Brar diagnosed Plaintiff with Major Depression and back pain.  (Tr. 281.)  Dr. Brar indicated that Plaintiff's GAF score at the time was 75, and that Plaintiff's highest GAF score in the past year was 80.[10]  (Tr. 281.)  Dr. Brar indicated that Plaintiff's back pain seriously limited, but did not preclude Plaintiff from performing work at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 283.)  Plaintiff also was seriously limited in, but not precluded from, dealing with normal work stress.  (Tr. 283.)

Dr. Brar opined that Plaintiff was limited, but could satisfactorily remember work-like procedures; maintain attention for two-hour segments of time; complete a normal workday and workweek without interruption from psychologically based symptoms; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine work setting; understand, remember, and carry out detailed instructions; set realistic goals or make plans independently of others; deal with the stress of semiskilled and skilled work; interact appropriately with the general public; maintain socially appropriate behavior; and travel in unfamiliar places.  (Tr. 283-84.)  According to Dr. Brar, Plaintiff was unlimited or very good in all other areas of mental ability and aptitude.  (Tr. 283-84.)

Dr. Brar also opined that Plaintiff was moderately limited in her ability to

---

[10]  A GAF score between 71-80 indicates no more than slight impairment in social, occupational, or school functioning.  If symptoms are present, they are transient and expect able reactions to psychosocial stressors.  *See Diagnostic and Statistical Manual of Mental Disorders*, *supra*, at 34.

maintain social functioning; was moderately limited in her ability to maintain concentration, persistence, or pace; was not, or was mildly limited in her ability to perform activities of daily living; and had suffered one or two episodes of decompensation within a twelve month period, each of at least two weeks in duration. (Tr. 285.)

Furthermore, Dr. Brar concluded that Plaintiff did not have a low IQ or reduced intellectual functioning (Tr. 284); Plaintiff's impairments were not expected to last at least twelve months; Plaintiff was not a malingerer; and Plaintiff's depression usually improved—and would improve—with medication.  (Tr. 286.)

**C.    Hearing Testimony**

**1.    Plaintiff's Testimony**

Plaintiff testified to the following.  Plaintiff passed the ninth grade but did not progress further in high school.  (Tr. 424.)  She is able to read and write a little but requires time to do so.  (Tr. 424.)  She tries to read the Bible but does not understand the words.  (Tr. 436.)  Plaintiff's son helps manage Plaintiff's money because Plaintiff has difficulty doing simple math.  (Tr. 435.)

Plaintiff has a driver's license but does not drive often; the last time she drove was approximately six months before her hearing.  (Tr. 425-26.)  She believes she is unable to work because she shies away from people, is forgetful, has trouble understanding things, and becomes frustrated.  (Tr. 426.)  She also suffers back pain every day and is unable to sit, stand, or walk for long periods of time.  (Tr. 427-28.)  Her back hurts when she lifts up her one-year-old grandson.  (Tr. 427.)  The stretches she learned in therapy do not alleviate her pain, but her Vicodin and Motrin medications

13

help.  (Tr. 428.)  She suffers no side effects from her medications.  (Tr. 429.)

Plaintiff lives at home with her thirteen- and fourteen-year-old children.  (Tr. 424.)

Plaintiff is overweight, which is attributed in part to her depression.  (Tr. 432.)  She is

able to wash the dishes by hand and sweep the floor.  (Tr. 429.)  She is unable to

vacuum, make her bed, and do the laundry.  (Tr. 429-30.)  Her adult children do the

grocery shopping, and sometimes she will go with them; however, most of the time she

does not join them because she does not want to go.  (Tr. 431.)  She spends most of

her day in her bedroom.  (Tr. 430.)  Occasionally she attends school fairs and church

with her children.  (Tr. 430.)  But she does not drive or take the bus; rather, her adult

children drive her around.  (Tr. 431.)

As to her ability to focus and maintain her attention, Plaintiff is unable to watch a

television program from beginning to end, focus on the plot, and understand the plot.

(Tr. 433.)  She can follow simple cooking recipes, however, so long as she has time to

work through them.  (Tr. 434.)

### 2.    The VE's Testimony

The ALJ posed the following hypothetical person to the VE:

> I want you to assume an individual of the same age, education, no past
> relevant work as the Claimant, limited ability to read, write and use numbers.
> I want you to further assume this individual is limited to lifting and carrying 20
> pounds occasionally, 10 pounds frequently, can stand and/or walk for six
> hours of an eight-hour day, is able to sit for about six hours, is limited to
> occasional stooping, is further limited to understanding, remembering and
> carrying out simple instructions only and performing repetitive tasks.

(Tr. 437-38.)  The VE testified that such a person could perform unskilled, light work as

a housekeeping cleaner (3 million positions nationally, 30,000 in Ohio); cafeteria

attendant (500,000 positions nationally, 15,000 in Ohio); and small part assembler (1.5

14

million positions nationally, 70,000 in Ohio).  (Tr. 438.)  The VE verified that his

testimony was consistent with the Dictionary of Occupational Titles ("DOT").  (Tr. 438.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she

establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y*

*of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered

disabled when she cannot perform "substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result

in death or which has lasted or can be expected to last for a continuous period of not

less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient

must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 *and*

416.1201.

If a claimant is entitled to disability benefits, such entitlement will be periodically

reviewed.  20 C.F.R. § 416.994(a).  There is a seven-step process for evaluating

whether a claimant has a continuing disability.

First, the Commissioner determines whether the claimant has an impairment or

combination of impairments that meets or medically equals an impairment in the

Listings.  20 C.F.R. § 416.994(b)(5)(i).  If the claimant has such an impairment or

combination of impairments, her disability will be found to continue.  *Id.*

Second, if the claimant does not have an impairment or combination of

impairments that meets or medically equals a listed impairment, the Commissioner

determines whether the claimant's condition has medically improved as shown by a

decrease in medical severity.  20 C.F.R. § 416.994(b)(5)(ii).  If there is no decrease in

the medical severity of the claimant's condition, there is no medical improvement.  *Id.*  If there is medical improvement, the Commissioner proceeds to step three.  *Id.*  If there is no medical improvement, the Commissioner proceeds to step four.  *Id.*

Third, if there is medical improvement, the Commissioner determines whether the improvement is related to the claimant's ability to do work, that is, whether there is an increase in the claimant's residual functional capacity based on the impairments that were present at the time of the most recent favorable medical determination.  20 C.F.R. § 416.994(b)(5)(iii).  If the medical improvement is not related to the claimant's ability to do work, the Commissioner proceeds to step four.  *Id.*  If the medical improvement is related to the claimant's ability to do work, the Commissioner proceeds to step five.  *Id.*

Fourth, if there is no medical improvement, or the medical improvement is not related to the claimant's ability to do work, the Commissioner determines whether certain exceptions from paragraphs (b)(3) and (b)(4) of 20 C.F.R. § 416.994 apply.  20 C.F.R. § 416.994(b)(5)(iv).  If none of the exceptions apply, the claimant's disability will be found to continue.  *Id.*  If an exception from paragraph (b)(3) applies, the Commissioner proceeds to step five.  *Id.*  If an exception from paragraph (b)(4) applies, the claimant's disability will be found to have ended.  *Id.*

Fifth, if the claimant's medical improvement is shown to be related to her ability to do work, or if one of the first group of exceptions to medical improvement applies, the Commissioner determines whether all of the claimant's current impairments in combination are severe.  20 C.F.R. § 416.994(b)(5)(v).  If the evidence shows that all of the claimant's current impairments in combination do not significantly limit her physical or mental abilities to do basic work activities, these impairments will not be considered

16

severe in nature and the claimant will no longer be considered disabled.  *Id.*  However, if the residual functional capacity assessment in step three shows significant limitation in the claimant's ability to do basic work activities, the Commissioner will proceed to step six.

Sixth, if the claimant's impairment or combination of impairments are considered severe, the Commissioner will assess the claimant's residual functional capacity based on all of her current impairments and consider whether she can still do work that she has done in the past.  20 C.F.R. § 416.994(b)(5)(vi).  If the claimant can do such work, disability will be found to have ended.  *Id.*  If the claimant cannot do such work, the Commissioner will proceed to step seven.  *Id.*

Seventh, if the claimant is not able to do work that she has done in the past, the Commissioner will determine whether the claimant can do any other work based on the claimant's residual functional capacity assessment, age, education, and past work experience.  20 C.F.R. § 416.994(b)(5)(vii).  If the claimant is unable to do other work, her disability will be found to continue.  *Id.*  If the claimant is able to do other work, her disability will be found to have ended.  *Id.*

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The most recent favorable medical decision finding that the claimant was disabled is the determination dated March 5, 1997.  This is known as the "comparison point decision" or CPD.

. . . . .

4.    The medical evidence establishes that the claimant currently has degenerative disc disease of the spine, obesity, borderline intellectual functioning, and a major depressive disorder.

17

5.    Since December 1, 2005, the claimant has not had an impairment or combination of impairments which meet or medically equals the severity of an impairment in 20 CFR Part 404, Subpart P, Appendix 1.

6.    Medical improvement occurred as of December 1, 2005.

7.    After careful consideration of the entire record, the undersigned finds that, beginning on December 1, 2005, the claimant has had the residual functional capacity to lift/carry 20 pounds occasionally, 10 pounds frequently; with the ability to stand/walk 6 hours out of 8 hours; sit 6 hours out of 8 hours; with occasional stooping; with the ability to understand, remember, carry out simple instructions and perform repetitive tasks.

8.    The claimant's medical improvement is related to the ability to work because it has resulted in an increase in the claimant's residual functional capacity.

9.    Beginning December 1, 2005, the claimant's impairments has [sic] continued to be severe.

10.   The claimant has no past relevant work.

11.   On December 1, 2005, the claimant was a younger individual.

12.   The claimant has a limited education and is able to communicate in English, but has a limited ability to read, write, and use numbers.

13.   Transferability of job skills is not an issue because the claimant does not have past relevant work.

14.   Beginning on December 1, 2005, considering the claimant's age, education, work experience, and residual functional capacity, the claimant has been able to perform a significant number of jobs in the national economy.

15.   The claimant's disability ended on December 1, 2005, and the claimant has not become disabled again since that date.

## V.    LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether

18

the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, nor weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

**B.    The ALJ's Analysis of Plaintiff's Medical Improvement**

Plaintiff argues that the ALJ's determination that Plaintiff's medical condition improved was erroneous because substantial evidence supports the conclusion that Plaintiff's medical condition did not improve. (Pl.'s Br. 10-12.) This argument is based on an incorrect legal standard, as a decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.

*Ealy*, 594 F.3d at 512.  Accordingly, this assignment of error lacks merit.

  **C.     The ALJ's Analysis of Whether Plaintiff Met or Medically Equaled
        Listing 12.05(C)**

Listing 12.05 regards mental retardation.  Listing 12.05.  Listing 12.05(C) may be satisfied if a claimant has "A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation on function."  Listing 12.05(C).  In 1997, Dr. Konieczny indicated that Plaintiff's IQ test revealed that Plaintiff had a Verbal IQ of 68, Performance IQ of 70, and Full Scale IQ of 67.  The ALJ determined that Plaintiff did not meet or medically equal Listing 12.05(C), however, in part because Plaintiff's IQ scores were invalid.  (Tr. 15.)  Plaintiff argues that the ALJ erroneously determined that her IQ scores were invalid.  For the following reasons, the Court finds that the ALJ did not err when he concluded that Plaintiff's IQ scores were invalid.

In 1997, Dr. Konieczny stated that Plaintiff's IQ scores placed Plaintiff in the deficient range of intellectual functioning; however, Dr. Konieczny explained that Plaintiff's history, presentation, and "questionable" effort during testing cast doubt on these IQ scores.  Ultimately, Dr. Konieczny diagnosed Plaintiff with Borderline Intellectual Functioning—a higher level of functioning.

Plaintiff argues that her IQ scores are valid because Dr. Konieczny opined that Plaintiff was not malingering.  (Pl.'s Br. 12.)  But Dr. Konieczny's opinion is not as strong on that point as Plaintiff suggests, as Dr. Konieczny failed to conclude that Plaintiff was not malingering.  Dr. Konieczny's opinion was more qualified, indicating only that a formal diagnosis of malingering was not warranted at that time.  Furthermore, the lack of

a "malingering" diagnosis at that time does not contradict Dr. Konieczny's opinion that Plaintiff's motivation and effort during her IQ testing was questionable and that Plaintiff functioned at a higher level than her IQ test results would suggest.  Accordingly, Dr. Konieczny's interpretation of Plaintiff's IQ scores was a valid basis for the ALJ to conclude that Plaintiff's IQ scores were invalid.

Finally, Plaintiff argues that her IQ scores must be valid because "the Commissioner obviously accepted the validity of the scores[] when it awarded Plaintiff benefits in 1997 based on said scores combined with Plaintiff's physical impairments," and "Given the nature of Plaintiff's intellectual impairments, it is not typical that medical improvement will occur."  (Pl.'s Br. 12.)  Plaintiff cites no evidence or authority in support of these assertions, and the Court will not speculate on their factual or legal bases. Furthermore, even if the Commissioner had relied on the IQ scores to determine that Plaintiff was disabled in 1997, it would be irrelevant as the question here is whether Plaintiff's medical condition improved since that time.  The ALJ relied on the psychiatric reviews performed by the Social Security Administration to determine that Plaintiff presently suffered only moderate difficulties in her abilities to perform activities of daily living and to maintain concentration, persistence, or pace; suffered only mild difficulties in her ability to maintain social functioning; and had no episodes of decompensation. (Tr. 15-16.)  Plaintiff has not explained how this basis for the ALJ's determination that Plaintiff did not meet or medically equal an impairment in the Listings was deficient.

In sum, the ALJ properly determined that Plaintiff's IQ scores were invalid, and Plaintiff has failed to explain how the ALJ's basis for determining that Plaintiff did not meet Listing 12.05(C) was otherwise deficient.  Therefore, this assignment of error lacks

merit.

### D.    The ALJ's Assessment of Plaintiff's Treating Physician's Opinions

The Social Security regulations contain a clear procedural requirement:  "We will always give good reasons in our notice of determination or decision for the weight we give [a claimant's] treating source's opinion." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)).  Pursuant to this procedural requirement, a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  S.S.R. 96-2p, 1996 WL 374188, at *5 (1996).

The ALJ noted Dr. Brar's opinions that Plaintiff had no or mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and one or two episodes of decompensation, each of extended duration.  (Tr. 19.)  Based on the record as a whole, however, the ALJ determined that Plaintiff had moderate restrictions in activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (Tr. 20.)  The ALJ did not provide good reasons or any explanation for the weight he gave Dr. Brar's opinions.  (*See* Tr. 20.)  Plaintiff argues that the ALJ's failure to give good reasons was harmful error that warrants remand.  For the reasons set forth below, however, the Court concludes that the ALJ's failure to give good reasons was harmless error and is not a basis for remand.

It appears that Dr. Brar is a treating source, as he evaluated and treated Plaintiff for her mental issues on several occasions between January 13, 2005, and September 14, 2006.[11]  Furthermore, the Commissioner does not contest that Dr. Brar is a treating physician.

Courts have recognized that "It is an elemental principle of administrative law that agencies are bound to follow their own regulations." *Wilson*, 378 F.3d at 545; *see also* 5 U.S.C. § 706(2)(D) ("The reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . without observance of procedure required by law."); *Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures.").  Generally, however, courts review the decisions of administrative agencies for harmless error.  *Heston*, 245 F.3d at 535; *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969) (noting that courts are not required to "convert judicial review of agency action into a ping-pong game" where "remand would be an idle and useless formality").  Accordingly, if an agency has failed to adhere to its own procedures, courts will not remand for further administrative proceedings unless "the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." *Connor v. U.S. Civil Serv. Comm'n*, 721 F.2d 1054, 1056 (6th Cir. 1983); *see also Am. Farm Lines v. Black*

---

[11]  A "treating source" is defined as a "physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you."  20 C.F.R. § 404.1502.  A treatment relationship is "an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s)."  *Id.*

23

*Ball Freight Serv.*, 397 U.S. 532, 539 (1970) (holding that agency's failure to follow its own regulations did not require reversal absent a showing of substantial prejudice by the affected party).

The procedural requirements of 20 C.F.R. § 1527(d)(2) provide a substantial right to Social Security disability claimants, *Wilson*, 378 F.3d at 547; however, "the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination," *Shinseki v. Sanders*, 129 S. Ct. 1696, 1706 (2009).

Plaintiff has failed to explain how the ALJ's failure to give good reasons for the weight he gave Dr. Brar's opinions harmed Plaintiff.  Plaintiff's only argument centers upon Dr. Brar's opinion that Plaintiff's back pain seriously limited Plaintiff's ability to perform at a consistent pace without an unreasonable number and length of rest periods.  Plaintiff argues that this opinion "proves" that Plaintiff has not improved medically and cannot perform substantial gainful activity.  (Pl.'s Br. 12-13.)  The Court disagrees.  Dr. Brar indicated that Plaintiff's back pain seriously limited, *but did not preclude* Plaintiff from performing work at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 283.)  This opinion does not support an argument that Plaintiff is unable to work at a consistent pace without an unreasonable number and length of rest periods, and Plaintiff fails to explain how this opinion proves Plaintiff is disabled.

Indeed, Dr. Brar's opinions are consistent with the ALJ's conclusion that Plaintiff is not disabled.  Except for Plaintiff's abilities to perform at a consistent pace and deal with normal work stress (both of which were deemed seriously limited but not precluded), Plaintiff's mental abilities were deemed, at most, "limited but satisfactory."

24

(Tr. 283-84.)  Dr. Brar indicated that Plaintiff did not have a low IQ or reduced intellectual functioning.  Furthermore, Dr. Brar concluded that Plaintiff's impairments were not expected to last at least twelve months, and that Plaintiff's depression usually improved, and would improve, with medication.  Although the ALJ erroneously failed to explain this opinion evidence and the weight he would give it, remand for the ALJ do so would be of no benefit to Plaintiff's position; therefore, remand is inappropriate.  *See Wilson*, 378 F.3d at 547 ("There is also the possibility that if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion, it may be irrelevant that the ALJ did not give weight to the treating physician's opinion, and the failure to give reasons for not giving such weight is correspondingly irrelevant.")

## VI.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED, and that judgment be entered in favor of the Commissioner.


s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date:  May 11, 2011


## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1).  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**